02-6248.051-JCD                                           December 8, 2005

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDUARDO GUDINO and ) | |
| OBDULIA PERALTA, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 02 C 6248 |
| ) | |
| TOWN OF CICERO et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Before the court is the motion of defendants Thomas Krummick, Dino Vitalo, and Waldemar Cruz for summary judgment, which is granted for the reasons stated below.

**BACKGROUND**

This is a § 1983 civil rights action that is related to Duran v. Town of Cicero, 01 C 6858.[1]  The Duran case is a civil rights action by numerous plaintiffs against the Town of Cicero and various Cicero police officers.  Both cases arise out of incidents involving the Cicero police that occurred on September 2, 2000, at and around the home of Alejandro and Maria Duran, who were having a party.  The plaintiffs in the instant case, Eduardo Gudino and Obdulia Peralta, were neighbors of the Durans who lived in separate houses across the street from the Durans.  The basic facts

---

[1] On October 18, 2002, the two cases were consolidated for all purposes.

regarding each plaintiff in the instant case are different; the commonality is that both Gudino and Peralta reacted to what was happening at the Duran home and then became involved in confrontations with the Cicero police. The relevant facts are taken from plaintiffs' deposition testimony.

**Obdulia Peralta**

Like the Durans, Peralta was having a party in her backyard on September 2, 2000. Peralta's party was much smaller than that of the Durans, with about fifteen guests. When Peralta and her guests heard screaming and commotion coming from the street in the front of the house and saw police officers running through yards toward the street, Peralta and her guests went out to stand in front of her house to see what was happening.

Peralta saw police officers, some with asps, hitting people in the Durans' front yard. She and her party guests began screaming at the police officers, telling them not to hit people. Some officers, using profanities, told them that they shouldn't be watching and to be quiet and go inside the house. The officers threatened to bring police dogs and that if Peralta and her guests didn't go inside, they would be arrested. One officer then started pushing Peralta and her guests to move them inside. When the pushing was occurring, Peralta "slipped and [] went back and [] banged against the [brick] wall [of her house]." (Peralta Dep. at

16.) She was cut near her left shoulder blade by a nail protruding from the brick.

Peralta identified two police officers at her deposition, only one of whom is a defendant: Sergeant Thomas Krummick.[2] Peralta stated that she saw Krummick, who was wearing a white shirt, in the street. He was one of the officers who used profanities and told the group that they would be arrested if they did not go inside.

**Eduardo Gudino**

On the night of September 2, 2000, Eduardo Gudino was sitting in the front room of his apartment on the second floor of a building across the street and three doors down from the Durans' home. He heard police sirens outside. When Gudino looked out the window, he saw police cars arriving and parking out front; a number of officers got out of their cars and talked amongst themselves. Gudino saw and heard the police officers, who seemed very "agitated," shouting at the Durans' party guests, so he got his video camera and began taping the events. He began taping from inside the apartment and then went outside and across the street to tape the events from a stairway at the house next door to the Durans'. Gudino saw officers hitting and pushing people and spraying them with pepper spray.

---

[2] As for the other officer whom she was able to identify, Peralta stated that he was in the street but did not state that he did anything in particular.

At some point, Gudino moved from his vantage point; one of the officers saw him and chased Gudino. Two officers stopped Gudino, and one of them, whom Gudino was unable to identify at his deposition, demanded that Gudino give them the video camera or they would take it from him. The other officer, whom Gudino has identified as Officer Robert DeCianni, then punched Gudino in the stomach. The first officer started to hit Gudino, but Gudino used the camera to block him. Then, according to Gudino, "they grabbed my hand, and they took the camera from me, but when they took the camera from me, I shook them off, and I started to run towards my house." (Gudino Dep. at 19-20.) The officers chased Gudino for a short time, but Gudino got away and eventually went back inside his house.

**Plaintiffs' Claims**

Plaintiffs filed this § 1983 civil rights action on September 3, 2002. The First Amended Complaint names as defendants Sergeant Krummick, Officer DeCianni, Officer Dino Vitalo, Officer Waldemar Cruz, "other unidentified police officers," and the Town. Count I (for Fourth Amendment violations) and Count II (for Fourteenth Amendment violations) are brought against the individual officers. In Count I, Peralta alleges that DeCianni, Vitalo, and Cruz used excessive force on him, failed to intervene to prevent the further use of excessive force, and confiscated his video camera without cause or justification. As for Peralta, she alleges in Count I

that Krummick failed to intervene to prevent "the further use of threats, profanity and excessive force." (First Amended Complaint, ¶ 36.) In Count II, plaintiffs allege that the individual defendants denied them equal protection. Against the Town, plaintiffs bring a Monell claim (Count III); a claim for spoliation of evidence (Count IV); and an indemnification claim (Count V). Plaintiffs seek compensatory and punitive damages.

Krummick, Vitalo, and Cruz now move for summary judgment on the claims that are asserted against them. (DeCianni and the Town have not moved for summary judgment.)

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

**A.   Obdulia Peralta**

In Count I, Peralta alleges that Sergeant Krummick "witnessed the use of threats, profanity and excessive force" against Peralta and failed to intervene to prevent the "further use of threats, profanity and excessive force," thereby violating her Fourth Amendment rights. Count II is an equal protection claim; Peralta alleges that Krummick's conduct was motivated by her ethnicity. Defendants point out, correctly, that Peralta's excessive force claim appears to be brought under the Fourth Amendment alone and that only in Peralta's response brief does she seem to assert an excessive force claim based on the Fourteenth Amendment. Because complaints need not identify legal theories, however, see Mid America Title Co. v. Kirk, 991 F.2d 417, 421 (7th Cir. 1993), we will treat the failure to intervene claim as being brought under both the Fourth and Fourteenth Amendments.

Peralta has no Fourth Amendment claim because she was not seized. For Fourth Amendment purposes, a seizure occurs when an officer intentionally uses physical force or a show of authority to restrain a person's liberty. See United States v. Mendenhall, 446

U.S. 544, 552 (1980). Peralta must show not only that her personal liberty was restrained, but that she actually yielded to a show of authority. See McCoy v. Harrison, 341 F.3d 600, 605 (7th Cir. 2003) (affirming grant of summary judgment in favor of defendant officer on Fourth Amendment excessive force claim where no seizure had taken place; officer was alleged to have hit plaintiff, but plaintiff walked away and defendant did not attempt to restrain her). There must be "an intentional acquisition of physical control," with the officer restraining the freedom of a person to walk away, thereby seizing that person. Id.

Peralta does not even argue that she was seized. The evidence is merely that she was jostled by someone else in her group and fell when the group was being pushed back toward the house by an officer. There is no evidence that the officer acquired physical control over Peralta or that she submitted to the officer's authority. Therefore, her failure to intervene claim must be analyzed under the Fourteenth Amendment.

The threshold issue is whether there is any evidence creating a genuine issue that Krummick failed to intervene in the pushing. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional

violation has been committed by a law enforcement official; <u>and</u> the officer had a realistic opportunity to intervene to prevent the harm from occurring." <u>Yang v. Hardin</u>, 37 F.3d 282, 285 (7th Cir. 1994).

In response to defendants' motion, Peralta submits an affidavit that states in relevant part:

> 4. I stood on the sidewalk just outside my home. With me were several of my relatives and friends.
>
> 5. We started yelling at the Police Officer not to beat up innocent women and children.
>
> 6. A Cicero Police Officer in a white shirt came over to us and ordered us to get inside the house.
>
> 7. After seeing photographs of the Cicero Police Officers, I now know that the Cicero Police Officer in the white shirt was Sergeant Krummick.
>
> 8. Sergeant Krummick was yelling at us to get inside, not to watch or otherwise we would be arrested and he would bring dogs. Sergeant Krummick was using vulgarities in English when he was yelling at us. I do not remember exactly what the vulgarities were, but before or after the vulgar words Sergeant Krummick said the word Mexican. I could tell by the tone of his voice and by what he said that he was swearing at me.
>
> 9. The front of my house comes right to the sidewalk, except for a small area by the gangway. A few feet into the gangway there is a metal fence.
>
> 10. When Sergeant Krummick yelled at us, I stepped back [sic] the sidewalk onto the gangway area.
>
> 11. Another Cicero Police Officer that was with Sergeant Krummick came to us and started shouting vulgarities and ordered us inside the house.
>
> 12. Sergeant Krummick was present and near that officer when this occurred. Sergeant Krummick was close enough

>to stop the Officer [sic] acts, but Sergeant Krummick did not stop that Officer, he did not call him back, and he did not order that officer to refrain from using vulgarities.
>
>13. When we did not move, the Cicero Police Officer, in the presence of Sergeant Krummick, violently pushed the group of people I was in toward the brick wall of my house.
>
>14. The whole group was pushed back and I was pushed against the brick wall of my house.
>
>15. On the wall was a protruding nail which cut me in the upper back.

(Peralta Aff. at 1-2.)

As defendants point out, this affidavit significantly expands upon and in some respects contradicts Peralta's deposition testimony. At her deposition, Peralta testified that after she and her guests began shouting at the police to stop hurting people, two officers came across the street. She was shown photographs of Cicero police officers, but she could not identify either one and could not identify which officer pushed her group. Peralta did identify Krummick and stated that he was wearing a white shirt and was standing in the street. Her testimony was that Krummick was shouting at her group, but that he did not cross the street all the way and come over to her group. She was asked whether Krummick crossed the short fence and came onto her property, and she answered no, that Krummick was in the street. (Peralta Dep. at 10-11.) To the extent that Peralta's affidavit attempts to imply that Krummick was standing immediately next to the officer who is

alleged to have pushed the group, it contradicts her earlier deposition testimony and therefore will be disregarded as an attempt to create a sham issue of fact. See Bank of Illinois v. Allied Safety Signal Restraint Sys., 75 F.3d 1162, 1168 (7th Cir. 1996) (a party cannot thwart the purposes of summary judgment by creating sham issues of fact with affidavits that contradict prior deposition testimony).

Plaintiffs devote much attention to the use of profanity, but that is irrelevant to our analysis because it is not a constitutional violation. The harm, for constitutional purposes, is the use of excessive force--the pushing. There is no evidence here that Krummick even knew that the unidentified officer was pushing the group. The evidence is that he was in the street, not on the sidewalk or inside Peralta's fence. There were a number of other altercations taking place in and around the street at the time as well. Even if Krummick had been standing next to the officer who pushed the group and could have seen it, there is no evidence that could have anticipated the push or had a realistic opportunity to prevent the harm from occurring. There is no evidence that the push was anything other than brief or that there were several pushes. Accordingly, summary judgment for Krummick and against Peralta will be granted on Count I (and Count II, to the extent that it asserts a Fourteenth Amendment claim based on the failure to intervene).

Because the factual predicate for the equal protection claim in Count II is the alleged failure to intervene, summary judgment for Krummick on that claim will be granted as well.[3]

**B. Eduardo Gudino**

In Count I, Gudino alleges that DeCianni, Vitalo, and Cruz used excessive force, failed to intervene to prevent the use of excessive force, and took his video camera. In Count II, Gudino alleges that DeCianni, Vitalo, and Cruz denied him equal protection.

Vitalo and Cruz contend that they are entitled to summary judgment on Gudino's claims because there is no evidence that either of them was involved in the altercation with Gudino. Gudino concedes that he has no evidence of Vitalo's involvement. Thus, summary judgment will be granted in favor of Vitalo and against plaintiff on Counts I and II.

As for Cruz, Gudino did not identify Cruz at his deposition as one of his two assailants. Gudino now submits an affidavit stating in pertinent part:

> 3. On September 2, 2000, I saw Cicero Police Officers beating up civilians at the Duran home.

---

[3] Even if we were to consider Peralta's statement in her affidavit that Krummick referred to her as a "Mexican" in a derogatory fashion, derogatory references to racial or ethnic background, by themselves, do not rise to the level of a deprivation of constitutional rights. See Bell v. City of Milwaukee, 746 F.2d 1205, 1259 (7th Cir. 1984), overruled on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir. 2005).

> 4. I took out my video camera, loaded a video tape and started video taping the Cicero Police Officers [sic] actions.
>
> . . .
>
> 6. Two Cicero Police Officers saw me and chased me.
>
> 7. After seeing photographs of the Cicero Police Officers, I now know that these officers were Waldemar Cruz and Robert Dicianni [sic].
>
> 8. Officer's [sic] Cruz and Dicianni chased me and demanded my video camera.
>
> 9. I refused to turn over my video camera and I was punched by Officers Cruz and Dicianni.
>
> 10. Officer Dicianni pulled my video camera away from me and took it away from me.

(Gudino Aff. at 1-2.)

At his deposition, however, Gudino testified that two officers chased him--DeCianni and an officer with "white hair." (Gudino Dep. at 26.) Cruz does not have white or blond hair and has never had white or blond hair. (Cruz Aff., ¶¶ 2, 3.) Gudino also testified that only one officer, DeCianni, punched him, and that both officers took the camera from him. Although Gudino did identify Cruz as being one of the officers at the Durans' home, he did not state that Cruz was one of his assailants. Instead, Gudino testified that he saw Cruz in the Durans' yard and said of Cruz: "That guy is very evil. Very evil." When asked what he saw Cruz do, Gudino replied that Cruz was "hitting people [at the Durans' home] mercilessly" and "one of the guys [who] was pushing people."

Gudino never mentioned that Cruz was one of the officers who confronted him. (Gudino Dep. at 21-22.)

Gudino's statements in his affidavit that Cruz chased him, demanded his video camera, and punched him so squarely contradict his earlier deposition testimony that they will be disregarded as an attempt to create a sham issue of fact. Because there is no evidence that Cruz used any excessive force against Gudino, or indeed was involved with Gudino at all, summary judgment in favor of Cruz and against plaintiff on Count I will be granted. Summary judgment in favor of Cruz and against plaintiff on Count II will also be granted because there is no factual predicate for an equal protection claim.[4]

### CONCLUSION

For the foregoing reasons, the individual defendants' motion for summary judgment is granted.

Summary judgment in favor of Thomas Krummick, Dino Vitalo, and Waldemar Cruz will be entered on Counts I and II. The case is terminated as against these defendants because Counts I and II are the only claims asserted against them. The remaining defendants are Robert DeCianni and the Town of Cicero.

---

[4] There is also no evidence that Cruz made any racially derogatory remarks.

DATE: December 8, 2005

ENTER: _____

John F. Grady, United States District Judge